FILED

SEP 20 2002

CLERK
U. S. DISTRICT COU:
MIDDLE DIST. OF AL
MONTGOMERY, ALA.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| STEPHEN R. GLASSROTH,<br><br>  Plaintiff,<br><br>v.<br><br>ROY S. MOORE,<br><br>  Defendant. | Civil Action No. CV 01-T-1268-N |
| MELINDA MADDOX and BEVERLY HOWARD,<br><br>  Plaintiffs,<br><br>v.<br><br>ROY MOORE, in his official capacity as Administrative Head of the Alabama Judicial System,<br><br>  Defendant. | Civil Action No. CV 01-T-1269-N |

**PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

The Defendant's opposition to the Plaintiffs' motion for summary judgment confirms the propriety of summary judgment in this case. Most tellingly, the Defendant does not controvert the vast majority of facts in the Plaintiffs' Statement of Undisputed Facts. Of those "facts" that the Defendant does dispute, the vast majority are, in fact, legal questions. The other disputes are trivial and immaterial.

I.  <u>Plaintiffs' Standing</u>

Whether a plaintiff has standing is a legal question, not a factual one. <u>See Ohio Ass'n of Indep. Sch. v. Goff</u>, 92 F.3d 419, 421 (6th Cir. 1996); <u>NRDC v. Texaco Refining & Mktg.</u>, 2 F.3d 493, 504 (3d Cir. 1993). Presumably because the Plaintiffs' standing to challenge the



monument is unassailable as a legal matter, the Defendant devotes his arguments on standing to a red herring, namely, that the "Plaintiffs' feelings have resulted not from the monument itself, but from Chief Justice Moore's election campaign, from his election as Chief Justice of the Alabama Supreme Court by the people of Alabama, and from his judicial philosophy in the exercise of his authority as Chief Justice." Def.'s Resp. at 12. To support this proposition, the Defendant cites statements from the Plaintiffs' depositions and declarations in which they took issue with Judge Moore's reference to the Ten Commandments during his election campaign, with his reliance on biblical principles in a recent opinion that he authored (see Ex Parte H.H., 2002 WL 227956 (Ala. Feb. 15, 2002)), and with other references to God in government events or documents. See Def.'s Resp. at 12-14. The Defendant concludes from this that "there is evidence in the record that disputes all three plaintiffs' claims that the monument has caused the hurt feelings that they have claimed." Id. at 14.[1]

The Defendant's conclusion simply does not follow from the evidence. The fact that the Plaintiffs have stated that they are/were offended by Judge Moore's reliance on religion during his campaign and in his written opinions, as well as by other references to "God" during government-sponsored events or in government documents, does not contradict their assertions – made in both their depositions and declarations – that the monument offends them as well. Indeed, their offense about these other matters is consistent with, rather than contradictory to,

---

[1] In arguing that the Plaintiffs are motivated by a general opposition to Moore and his "world view," the Defendant also cites to a letter from Plaintiffs' counsel Morris Dees to co-counsel Ayesha Khan which refers to Moore as a "lone religious nut in partnership with a fanatical church." See Def.'s Resp. at 10. This letter is work product that was inadvertently sent to Defendant's counsel. Mr. Dees asked Defendant's counsel to return the letter but Defendant's counsel apparently retained a copy. (Correspondence relating to this inadvertent disclosure is available for the Court's review if necessary.) The letter includes several hyperbolic statements, all of which must be understood in the context of a privileged conversation between co-counsel. In any event, the contents of the letter do not constitute proper evidence and have no relevance to the legal issues in the case.

their offense about the monument; it confirms that they are, in the Defendant's words, "strict separationist[s]." Id. at 14.

The Defendant also asserts that the Plaintiffs' assertions of offense and intimidation are incredible because they are strong, accomplished individuals, and because they have not demonstrated that they have "experienced any adverse action on account of the monument." See id. at 14-17. But the fact that the Plaintiffs are strong, accomplished individuals (a proposition with which the Plaintiffs modestly concede agreement) does not contradict that they are offended by the monument. (Indeed, it is usually the strongest among us who are willing to publicly voice our offense at government action.[2]) The Establishment Clause does not confine its protections to "eggshell plaintiffs." Furthermore, as described more fully below, see infra at pp. 4-7, the case law imposes no requirement that a Plaintiff must have suffered adverse consequences beyond the unwelcome exposure to the display at issue. Thus, the Defendant has it backward when he says that the Plaintiffs have not offered "objective evidence corroborating [their] feeling[s]." Def.'s Resp. at 15 (emphasis added). It is the Defendant who must offer "significant probative evidence" to contradict that the Plaintiffs feel this way. See 11 Moore's Federal Practice § 56.13[2] at 56-147 (3d ed. 1997); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The legal issue relates to how the Plaintiffs feel; the Plaintiffs have provided

---

[2] The Defendant asserts that Melinda Maddox's statement that the monument "intimidates" her and "makes [her] fear adverse consequences" is contradicted by her testimony that she is known as the "tiny tiger" and "shark" by her friends. See Def.'s Resp. at 15. This is not a contradiction; indeed, it takes a "tiny tiger" to oppose the actions of a judge before whom an attorney may appear in the future. In any event, this is only one of several reactions that Ms. Maddox has to the monument. The monument also makes her feel "like an outsider in the political and legal community, as well as in the public at large." Maddox Decl., Pls.' Ex. 23 at ¶ 8; see also id. at ¶¶ 9-10, 13. In addition, the monument offends her because she believes it "degrades the sanctity of religion," and "demeans religion and cheapens it for everybody." Id. at ¶ 17. The Defendant has proffered no evidence whatsoever to contradict these assertions, or the assertions by the other Plaintiffs that they are offended by the monument for reasons distinct from intimidation or fear of adverse consequences. See infra at pp. 7-8.

the Court with the best evidence of this, namely, their own words; they are under no obligation to provide corroborating evidence therefor. (Indeed, it is not entirely clear what such corroboration would look like.)

The legal proposition advanced by the Defendant – that a belief that the law is being violated is inadequate on its own to establish standing, see Def.'s Resp. at 11, 18-19 – is uncontroversial. A Plaintiff in an Establishment Clause case, as in all others, must demonstrate that the challenged action directly affects him. See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, 454 U.S. 464, 486 (1982). Such "standing may be predicated on noneconomic injury." Id. The Court gave as an example Abington School District v. Schempp, 374 U.S. 203 (1963), where children were allowed to challenge Bible reading in the public schools because they "were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." Valley Forge, 454 U.S. at 487 n.22 (citing Schempp, 374 U.S. at 224 n.9).

Under established Eleventh Circuit precedent, a plaintiff has standing to challenge a religious display if the plaintiff has unwelcome direct contact with the display in the course of his ordinary civic, business, or personal affairs, or if he has avoided a public place to which he is legally entitled to go in order to avoid contact with a religious display located there. In ACLU of Georgia v. Rabun County Chamber of Commerce, Inc., 698 F.2d 1098 (11th Cir. 1983), the plaintiffs sought to challenge a lighted cross in a state park. Both of the plaintiffs were regular campers (but neither of them had camped at the park in question because of their opposition to the cross), and one of these two plaintiffs could also see the cross from the porch of his summer cabin. Id. at 1108. The Court found that both plaintiffs had demonstrated an "individualized injury" adequate to bestow standing. Id. The injury arose because they are "forced to locate

4

other camping areas or to have their right to use [the state park] conditioned upon the acceptance of unwanted religious symbolism," id., and because the neighboring plaintiff had "little choice" but to view the cross from his porch.  Id.[3]

Similarly, in Saladin v. City of Milledgeville, 812 F.2d 687 (11th Cir. 1987), the Court held that the plaintiffs had standing to challenge a city seal that included the word "Christianity," on the basis of statements in their affidavits that they regularly received correspondence on city stationery bearing the seal, that they were active in civic organizations that received proclamations from the mayor's office embossed with the seal, and that the viewings of the seal made them feel like "second class citizens."  Id. at 692-93.  The Court concluded:

> The plaintiffs here, unlike the plaintiffs in Valley Forge, clearly have more than an abstract interest in seeing that the City of Milledgeville observes the Constitution: they are part of the City and are directly affronted by the presence of the allegedly offensive word on the city seal.

Id. at 693.[4]

---

[3] The Defendant takes issue with the fact that Plaintiff Maddox was willing to become a plaintiff on the basis of newspaper and television reports, before she had seen the monument.  Def.'s Resp. at 13; Def.'s Ex. X, Maddox Depo. at 39-40.  The Eleventh Circuit held in Rabun County that viewing a display is not a prerequisite to having standing to challenge it.  See id., 698 F.2d at 1107 & 1107 n.17.  In any event, Ms. Maddox viewed the monument in person before she filed suit.  See Ex. X, Maddox Depo. at 47.

[4] See also Doe v. County of Montgomery, 41 F.3d 1156, 1158 (7th Cir. 1994) (plaintiffs who occasionally entered a courthouse in order to serve as jurors, attend meetings of the county board, and visit government offices had standing to challenge the display of a religious sign on the courthouse); Washegesic v. Bloomingdale Pub. Schs., 33 F.3d 679, 681 (6th Cir. 1994) (recent graduate of a public high school had standing to challenge the display of a religious painting in the school because he periodically saw it while attending school events with his still-enrolled girlfriend); Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991) (plaintiff had standing to challenge the inclusion of a cross in a city's insignia because he regularly saw the insignia on city correspondence and at locations around the city); Foremaster v. City of St. George, 882 F.2d 1485, 1490 (10th Cir. 1989) (plaintiff had standing to challenge the inclusion of a Mormon temple in a city seal that he regularly saw, stating that the plaintiff's "allegations of direct, personal contact suffice[d] as non-economic injury"); Allen v. Hickel, 424 F.2d 944, 946-47 (D.C. Cir. 1970) (residents who had right to use local public park had standing to challenge erection of creche in it).  Indeed, as stated by Judge Posner in ACLU of Illinois v. City of St. Charles, 794 F.2d 265, 268 (7th Cir. 1986), "if the injury . . . suffered by the involuntary audience for a display alleged to constitute an establishment of religion does not confer standing to sue, there will be no judicial remedy against establishments of religion that do not depend on public funds."

Following this body of law, courts have upheld plaintiffs' standing to challenge Ten Commandments displays that they periodically encounter during the course of their ordinary affairs. In Harvey v. Cobb County, 811 F. Supp. 669, 674-75 (N.D. Ga. 1993), aff'd, 15 F.3d 1097 (11th Cir. 1994) (unpublished), the Eleventh Circuit summarily affirmed a lower court decision finding that the plaintiff-attorney had standing to challenge a Ten Commandments panel in the State Court Building because his law practice required him to enter the building and have unwelcome contact with the display. The court explained that "it is enough that Harvey's job on occasion brings him into direct contact with the panel, and this sets Harvey apart from the general public and shows that his grievance is not shared in substantially equal measure by all of a large class of citizens." Id. at 675 (quotations omitted).

Similarly, in Suhre v. Haywood County, 131 F.3d 1083 (4th Cir. 1997), the Fourth Circuit ruled that an avowed atheist who periodically attended hearings in a courtroom in which the Ten Commandments were displayed had standing to challenge the display because "[t]he injury that gives standing to plaintiffs in [religious display] cases is that caused by unwelcome direct contact with a religious display that appears to be endorsed by the state." Id. at 1086. The Fourth Circuit explained:

> [T]he standing inquiry in Establishment Clause cases has been tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer. . . . [T]he Establishment Clause plaintiff is not likely to suffer physical injury or pecuniary loss. Rather the spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an establishment of religion.

Id. (citations omitted). The court added: "like Schempp before it, Valley Forge recognized that direct contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen's general grievance against unconstitutional conduct." Id.

Numerous other courts have reached the same conclusion.[5]

Here, the Plaintiffs have explained in their declarations that they visit the Alabama Judicial Building, and must therefore view the monument, on a regular basis in order to fulfill their professional duties. See SUF ¶¶ 76-78. The Defendant makes no attempt to dispute this. Plaintiffs Maddox and Howard have stated that they visit the Rotunda with less frequency as a result of the Monument's placement. See id. at ¶¶ 77-78. This fact is also wholly undisputed by the Defendant. Finally, all three of the Plaintiffs have explained that the monument makes them feel like outsiders in the judicial, political, and legal communities:

- Mr. Glassroth has explained that the monument makes him feel unwelcome because it sends him the message that "here in Alabama, we – the leaders and members of the state judiciary – favor those who believe [in] the Ten Commandments." See Glassroth Decl., Pls.' Ex. 22 at ¶ 8. It also offends him because he believes "that religion and spirituality are intensely private matters," and it makes him feel "that the state of Alabama views [his] failure to incorporate the Ten Commandments into [his] personal and professional life as a defect in character and/or professional integrity." Id. at ¶¶ 10, 12.

- Ms. Maddox has explained that: "The monument makes me feel that the Alabama State government does not represent the view of myself and anyone other than certain Protestant Christians, and conveys the message to me that if I do not subscribe to the beliefs on the monument, then the government and especially the Alabama justice system will look upon me with disfavor." Maddox Decl., Pls.' Ex. 23 at ¶ 10. The monument also makes her worry and

---

[5] In Books v. City of Elkhart, Ind., 235 F.3d 292 (7th Cir. 2000), the court ruled that two plaintiffs had standing to challenge the display of a Ten Commandments monument in front of a city municipal building because they visited the building to attend city council meetings and pay traffic tickets. Id. at 297 & 300. In ACLU of Kentucky v. McCreary County, 96 F. Supp. 2d 679 (E.D. Ky. 2000), the court ruled that plaintiffs who had to enter a courthouse to conduct civic business had standing to challenge the display of the Ten Commandments within the courthouse. Id. at 682-83. And in Adland v. Russ, 107 F. Supp. 2d 782 (E.D. Ky. 2000), the court held that plaintiffs who regularly traveled to Kentucky's State Capitol had standing to seek an injunction against the relocation of a Ten Commandments monument onto the State Capitol grounds. Id. at 784; see also Freethought Soc'y v. Chester County, 191 F. Supp. 2d 589, 593 (E.D. Pa. 2002) (plaintiff who must on occasion go to courthouse building to get a dog license or serve as a juror or witness has standing to challenge Ten Commandments display in building), conditionally stayed by, 194 F Supp. 2d 437 (E.D. Pa. 2002); ACLU of Tenn. v. Hamilton County, 202 F. Supp. 2d 757, 761 (E.D. Tenn. 2002) ("Unwelcome direct contact with the Ten Commandments plaques gives rise to sufficient injury to create standing for individuals"); ACLU of Ohio Found. Inc. v. Ashbrook, 211 F. Supp. 2d 873, 880-82 (N.D. Ohio 2002) (attorney who practices law in county courthouse has standing to challenge courtroom Ten Commandments display).

fear that she and her clients would not receive equal justice from the courts housed there. See id. at ¶¶ 11, 12. She is also offended because, in her view, the monument demeans and cheapens religion, which should be left as a private matter between her and her God. See id. at ¶ 17.

- Ms. Howard states that the monument makes her feel like an outsider because it "reflects religious beliefs that are different from and foreign to my own." Howard Decl., Pls.' Ex. 24 at ¶ 7. It makes her feel that she is "supposed to believe in the God [the the monument] mentions over and over again." Id. at ¶ 8. It makes her worry that she and her clients "will not receive the same consideration and justice as Christian, especially Protestant, attorneys." Id. In sum, the monument gives her the impression "that the courts of Alabama are governed by the Bible, by religion rather than by laws, and that those who disagree are unwelcome in the Alabama halls of justice." Id. at ¶ 14.

As stated above, although the Defendant claims that other incidents are also offensive to the Plaintiffs, he cites no evidence whatsoever to dispute the fact that the monument is among those items with which the Plaintiffs take offense. Thus, the Plaintiffs have unequivocally established their standing to bring this suit.

II.     Whether the Monument is a Religious Display

The Defendant asserts that there is a dispute of fact over whether the Ten Commandments are religious. See Def.'s Resp. at 21-26. He argues that the first four Commandments substantially influenced the Declaration of Independence and the First Amendment to the Bill of Rights, and that they have the secular significance of providing a "moral foundation governing conduct in civil society." See id. at 21-24. He further argues that when the Ten Commandments are placed in a "civic context," rather than in a "church or synagogue," they lose their "sacramental characteristic" and become "principles that have inspired our secular, legal tradition" and "just very, very good citizenship." Id. at 24-26.

As the Defendant himself admits, this argument is a direct challenge to the explicit holding of the United States Supreme Court in Stone v. Graham, 449 U.S. 39, 41 (1980). See

8

Def.'s Resp. at 21, 24. In <u>Stone</u>, the Court held that the Ten Commandments – even when displayed outside a church or synagogue, and even when presented alongside a statement that they are being displayed for their "secular" significance, <u>Stone</u>, 449 U.S. at 40 n.2 – are "undeniably a sacred text in the Jewish and Christian faiths" and "do not confine themselves to arguably secular matters." Even if this Court were to share the Defendant's view that this conclusion in <u>Stone</u> is "erroneous" (<u>see</u> Def.'s Resp. at 21, 24), the Court is not free to ignore it; it merits no citation to say that this Court is bound by the holdings of the United States Supreme Court.[6]

The Defendant also admits that his argument that the Ten Commandments are not religious flies in the face of numerous "lower court cases applying the <u>Stone</u> ruling to Ten Commandments plaques and monuments installed in courtrooms and public parks." Def.'s Resp. at 21. The Defendant claims that these cases should be ignored because "in none of those cases did the defenders of the plaques and monuments at issue challenge the factual premises about the Ten Commandments set forth in <u>Stone</u>." <u>Id.</u> This is patently false. In almost every case, the defendants argued that the Ten Commandments had a dual nature, and that the displays were intended to reflect the secular, rather than religious, aspects of the Commandments.[7] Most

---

[6] Indeed, this Court is bound by Supreme Court precedent even when the rationale for the precedent has been eroded by subsequent decisions: "if a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997) (quoting <u>Rodriguez de Quijas v. Shearson/Am. Express, Inc</u>, 490 U.S. 477, 484 (1989)). In this case, of course, no erosion has occurred.

[7] <u>See, e.g.</u>, <u>Indiana Civil Liberties Union v. O'Bannon</u>, 259 F.3d 766, 771 (7th Cir. 2001) (defendant asserted that "monument is intended to honor our history by reminding society of its core values and to honor our legal tradition since several of our secular laws are parallel to the Ten Commandments); <u>Books</u>, 235 F.3d at 304 (city claimed Ten Commandments display was intended to recognize the historical and cultural significance of the Ten Commandments); <u>ACLU Neb. Found. v. City of Plattsmouth</u>, 186 F. Supp. 2d 1024, 1033 (D. Neb. 2002) (city asserted that Ten Commandments "have a role in secular history and the development of legal codes"); <u>ACLU of Ky. v. Pulaski County</u>, 96 F. Supp. 2d 691, 698 (E.D. Ky. 2000) (defendants asserted that Ten Commandments were

analogously to this case, the defendants in <u>Chester County</u>, 191 F. Supp. 2d 589, argued that the Ten Commandments have a "dual nature" and were being displayed to commemorate their importance in our common Western tradition, and that "their placement on a courthouse building provides the requisite secular context to justify their continued display." <u>Id.</u> at 597.  Indeed, in making this argument, the defendants relied on the writings of Michael Novak (<u>see</u> <u>id.</u>), the very expert on whom the Defendant relies here.  <u>See</u> Def.'s Resp. at 23.  This, however, did not stop the court from granting summary judgment:  "Interesting and sensitive as the[se] observations are, they nevertheless cannot negate the plain words of the tablet."  <u>Chester County</u>, 191 F. Supp. 2d at 598.

The arguments made by the Defendant are virtually identical to those made in <u>Chester County</u> and the other cases cited above.  <u>See</u> Def.'s Resp. at 21-24 (describing alleged secular relevance of the first four Commandments); <u>id.</u> at 24-26 (asserting that the Ten Commandments are secular when presented in a court of law rather than in a church or synagogue).  As the courts concluded in each case, these arguments have been foreclosed by the Supreme Court's holding in <u>Stone</u>.  In any event, these arguments are just that:  arguments.  They do not rest on any factual disputes.   Whether the Ten Commandments are considered "religious" for purposes of Establishment Clause analysis is a legal question, and it is one that the United States Supreme Court has already unequivocally answered.

---

posted "in order to teach Pulaski County residents about American religious history and the foundation of the modern state"); <u>McCreary I</u>, 96 F. Supp. 2d at 686 (same); <u>Kimbley v. Lawrence County, Ind.</u>, 119 F. Supp. 2d 856, (S.D. Ind. 2000) (county claimed that purpose for monument that included Ten Commandments was "to display values common to the local community, including both secular and religious values"); <u>Cobb County</u>, 811 F. Supp. at 677 (the county argued that the display represents a recognition of a "historical, jurisprudential cornerstone of American legal significance"); <u>ACLU of Ky. v. Grayson County</u>, No. Civ.A.4:01CV-202-M, 2002 WL 1558688, at *2 (W.D. Ky. May 13, 2002) (defendant sought "to educate the citizens of the counties about the foundation of our American law and government" through display that included the Ten Commandments).

III.    Whether the Monument Was Erected With a Religious Purpose

The Defendant claims to dispute three facts relevant to purpose: (1) whether the monument contains "religious text or excerpts;" (2) whether Moore was "motivated" by a religious purpose; and (3) whether Moore "partnered" with a religious ministry to "publicize the monument and fund his defense." Def.'s Resp. at 26. In fact, as described more fully below, none of these questions turns on disputed facts. First, the contents of the monument and the sources from which the monument quotations are taken are wholly undisputed. Second, regardless of whether one labels it "motivation" or "purpose," the Defendant's brief neither disputes nor disavows the numerous statements during Moore's deposition and in his public remarks that unequivocally establish the reasons for his action. Third, regardless of whether the relationship between the Defendant and Coral Ridge Ministries should be termed a "partnership," the underlying facts concerning his connections to the church are undisputed.

A.    "Religious Sources" Or "Religious Excerpts"

Perhaps the most telling example of the desperation of the Defendant's position can be found in the first subsection of his brief regarding purpose. Rather than responding to the Plaintiffs' argument that all of the quotations on the monument contain religious references (see Pls.' Mem. at 5, 11), the Defendant expends several pages refuting an argument that was never made, i.e., that the quotations are taken from religious texts. See Def.'s Resp. at 26-28. But the Plaintiffs agree with the Defendant that the texts from which the quotations are taken are not themselves religious. The Plaintiffs' point – one with which the Defendant appears to take no issue – is that in each instance, the Defendant has excerpted from those larger, secular texts the small passage that includes a religious reference. By doing so, the

Defendant has "effectively changed the meaning and significance of each of the documents from the original." McCreary I, 96 F. Supp. 2d at 687-88.

B.     Moore's "Motivation" and "Purpose"

The Defendant argues that Moore's "motivation" was not religious.  This argument appears to rest on an unexplained distinction between "motivation" and "purpose."  See Def.'s Resp. at 29 (placing "motivation" in quotations marks and asserting that Moore's "motivation [is] wholly irrelevant and immaterial to this case," whereas his "purpose" is not).  Because the Plaintiffs fail to appreciate the distinction between "motivation" and "purpose," they used these terms interchangeably in their opening brief.[8]  Although the parties may disagree on semantics, both the Plaintiffs and Defendant agree that Justice Moore's "purpose" was to "restore the moral foundation of law."  See id. at 29; Pls.' Mem. at 14.

The Plaintiffs' brief did not stop there, however.  Rather, the Plaintiffs explained, in Chief Justice Moore's own words, what he means by this term.  See Pls.' Mem. at 11-16; SUF ¶¶ 10-33.  To Justice Moore, "moral" means a "sense of right and wrong" that is "established by God."  SUF ¶ 11; Moore Depo. by Khan, Ex. 8 at 19.  He explained in his written unveiling speech that restoration of this moral foundation was necessary because "many judges and other government officials deny any higher law and forbid the teaching to our children that they are created in the image of an Almighty God," and have "turned away from those absolute standards," which has resulted in a "whirlwind in our schools, in our homes, and in our work places."  SUF ¶ 11.  He stated that "[i]t is axiomatic that to restore

---

[8] The Eleventh Circuit appears to suffer from the same semantic "confusion."  Church of Scientology Serv. Org. v. City of Clearwater, 2 F.3d 1514, 1527 (11th Cir. 1993) (referring to whether a government official was "motivated" by a secular or religious objective).

morality we must first recognize the source from which all morality springs," and he expressed his hope that the day of the unveiling would mark the beginning of a "return to the knowledge of God in our land." Id.   During the unveiling speech, he elaborated on the significance of the quotations inscribed on the four sides of the monument:

> Surrounding the monument, you see every ounce of support for the acknowledg[]ment of the sovereignty of that God and those absolute standards upon which our laws are based.  Oh, this isn't surrounding a plaque with history, historical documents.  All history supports the acknowledgment of God.  You'll find no documents surrounding the Ten Commandments because they stand alone as a[n] acknowledgment of that God that's contained in our pledge, contained in our motto, and contained in our oath.

Transcript of Unveiling, Pls.' Ex. 26 at 15.  Consistently with his unveiling speech, Moore confirmed at his deposition that the "point of the Ten Commandments monument . . . is to acknowledge the sovereignty of God and the higher laws by which we are governed." SUF ¶ 13.  He also acknowledged that he had made several other public statements along these same lines.  See id. at ¶¶ 16, 24, 27, 30.  Furthermore, Defendant Moore stated numerous times at his deposition that the God he intended to represent through the monument is the Judeo-Christian God of the Christian Bible.  See id. at 16, 31-32, 33, 45, 47.[9]

Nowhere in his brief does the Defendant disavow these statements or cite any evidence demonstrating that they are inaccurate or untrue.  Instead, he willingly admits that the purpose behind the Ten Commandments monument is "to remind the judges, lawyers and people of Alabama of 'the moral foundation of law' of the United States of America." Def.'s Resp. at 25.  According to the Defendant's brief, "that moral foundation [can]not be understood apart from the official national commitment to an authority higher than the authority of the State; that there is a moral law which the State is powerless to alter; that the

---

[9] The Defendant's deposition testimony and his public remarks are properly considered by the Court in evaluating the Plaintiffs' motion.  See Fed. R. Civ. P. 56(c).

individual possesses rights confirmed by the Creator which government must respect." Id. (internal quotations omitted).    Although the Defendant concedes it would be unconstitutional to erect a monument as a "call for . . . people to 'venerate' the Commandments," he seeks refuge in yet another semantic distinction – arguing that the monument at issue here is constitutional because it only calls on people "to consider [the Ten Commandments] as providing the best source of absolute standards that serve as the moral foundation of law and which form the basis of morality." Id. (internal quotations omitted, emphases added).

To withstand summary judgment, the non-movant must present substantial evidence (not just a "scintilla of evidence" or "merely colorable" evidence or bare allegations) to counter the movant's evidence as to one or more issues of material fact. See Anderson, 477 U.S. at 249-52.   But as noted, Defendant Moore has offered no evidence to refute the accuracy of the deposition passages and public remarks quoted in the Plaintiffs' motion and described above.[10]   Instead, the Defendant argues that the purpose evidenced by those statements – to remind the public of a purportedly "official national commitment" to the "sovereignty of God," and to call on people "to consider the Ten Commandments as the best source of absolute [moral] standards" – is not a religious one.   The Defendant's characterization of this argument as a factual – susceptible of proof by expert testimony – is not only counterintuitive, but also inconsistent with Supreme Court case law. See Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 315 (2000) (affirming, in context of Lemon test's

---

[10] Some courts have held that a defendant may create a genuine issue of fact by presenting an affidavit that contradicts his or her deposition testimony if the affidavit includes an explanation for the contradiction. See, e.g., Kennett-Murray Corp. v. Bone, 622 F.2d 887, 893 (5th Cir. 1980).  Most courts, however, have reached the opposite conclusion.  See, e.g., Mack v. United States, 814 F.2d 120, 125 (2d Cir. 1987); Camfield Tires v. Michelin Tire Corp., 719 F.2d 1361, 1364 (8th Cir. 1983).  In any event, in this case, the Defendant has not claimed that his deposition testimony was wrong or inaccurate.

purpose prong, that "[w]hether a government activity violates the Establishment Clause is 'in large part a legal question to be answered on the basis of judicial interpretation of social facts'") (emphasis added).  Surely a trial is not needed to determine whether Chief Justice Moore's undisputed statements of purpose should be characterized as secular or religious.[11]

> C.    The Relationship Between Justice Moore and Coral Ridge Ministries

The Defendant asserts that the following facts concerning Coral Ridge Ministries are disputed: (1) that "Justice Moore and his agents have partnered with Coral Ridge Ministries (CRM) . . . to publicize the monument and fund its defense;" (2) that Justice Moore's "attorney gave CRM exclusive rights to video the installation of the monument;" (3) that "Mr. Melchior finalized the financial relationship with CRM in a letter to Tom Rogeberg;" (4) that "Mr. Melchior has exercised some editorial control over the manner in which the monument was described in CRM's publications;" and (5) that "[a]t CRM's request, one of its own lawyers – Herb Titus – was added to the Chief Justice Moore's legal defense team." Def.'s Resp. at 10-11 (internal quotations omitted).  The Defendant claims that the plaintiffs have made these assertions "without citing any direct evidence whatsoever in support of their allegations." Id. at 10.  The Plaintiffs will address each of these facts in turn.

By stating that "Justice Moore and his agents have partnered with Coral Ridge Ministries ("CRM") . . . to publicize the monument and fund its defense," Plaintiffs were

---

[11] The Defendant's failure to contradict the Plaintiffs' evidence of the Defendant's religious purpose is made worse by the fact that he bears the burden of persuasion on this point.  See Anderson, 477 U.S. at 252 ("in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden").  "Where a plaintiff shows by direct evidence that a sectarian or religious purpose was a substantial or motivating factor [for government action], the burden shifts to the defendant to show by a preponderance of the evidence that action challenged under the Establishment Clause would have been undertaken even in the absence of such improper considerations." City of Clearwater, 2 F.3d at 1530; see also O'Bannon, 259 F.3d at 771 (placing burden of demonstrating secular purpose for display of Ten Commandments on government); Books, 235 F.3d at 304 n.8 (same).

drawing a conclusion from the facts that Moore has given numerous interviews regarding the monument for CRM's programs, that Mr. Melchior asked CRM to provide funds for Moore's defense in this case, and that CRM has provided substantial funds therefor. See Pls.' Mem. at 16-17 (citing SUF ¶¶ 63, 65, 67-70, 73).   Although the Defendant disputes the conclusion that the Plaintiffs have drawn, he does not dispute any of these underlying facts.

In stating that Justice Moore's "attorney gave CRM exclusive rights to video the installation of the monument," Plaintiffs meant no more and no less than the Defendant has himself stated in his Declaration: "through my attorney, D. Stephen Melchior, I granted Coral Ridge Ministries Media, Inc. permission to video the installation of the monument after I learned from my said attorney that Coral Ridge Ministries Media, Inc. requested permission to video such installation."   Moore Decl., Def.'s Ex. EE at ¶ 13.   The Plaintiffs used the word "exclusive" because the deposition testimony was undisputed – and the Defendant does not dispute in his Response – that no other media were present for the event. See Pls.' Ex. 9, Rogeberg Depo. at 50.   Whether this amounts to the grant of an exclusive right to film the installation may be a matter of interpretation, but the underlying facts are not the subject of any dispute between the parties.

The Defendant disagrees with Plaintiffs' statement that "Mr. Melchior finalized the financial relationship with CRM in a letter to Tom Rogeberg" (see Def.'s Resp. at 10), but he takes no issue with the underlying facts for this assertion.   He takes no issue with the facts that he sent a letter to Tom Rogeberg of CRM requesting money from CRM to fund Justice Moore's defense in this case (see SUF ¶ 67), that Mr. Rogeberg received the letter (see Ex. 9, Rogeberg Depo. at 16), and that CRM agreed to provide the requested funds. See SUF ¶ 69.   The only possible basis for the Defendant's disagreement with the Plaintiffs'

characterization of the facts is that, in the Defendant's view, the letter served to "request" the funds, rather than to "finalize[] the financial relationship with CRM." The Plaintiffs take no issue with this alternative characterization of Melchior's letter. The important points – and ones with which the Defendant does not disagree – are that Mr. Melchior made the request and that CRM agreed to provide the funds as requested. See id. at ¶¶ 67, 69.

Plaintiffs stated that "Mr. Melchior has exercised some editorial control over the manner in which the monument was described in CRM's publications." Pls.' Mem. at 17. The evidence cited for this assertion was a statement, in an email from one CRM employee to another, that Mr. Melchior encouraged CRM to depict the monument as a non-religious document in CRM's "formal or informal communications." See SUF ¶ 73. Again, although the Defendant appears to dispute whether this encouragement amounts to the exercise of editorial control, he takes no issue with the underlying fact.

Finally, Plaintiffs asserted that one of CRM's attorneys – Herb Titus – was added to the Defendant's legal team at the request of CRM. Plaintiffs had based this assertion on statements made by another CRM attorney during depositions in this case, but the Defendant's declaration takes issue with those statements. See Moore Decl., Def.'s Ex. EE at ¶ 17. This is the only true dispute of fact that the Defendant has demonstrated and the Plaintiffs agree with the Defendant that it is "wholly irrelevant." Def.'s Resp. at 11.

As stated in the Plaintiff's opening brief, the facts pertaining to CRM "provide[] further evidence of [the Defendant's] religious purpose." Pls.' Mem. at 17 (emphasis added). That purpose is firmly established by the monument itself and by the Chief Justice's public statements and deposition testimony. Because the Coral Ridge facts merely confirm the legal conclusion that flows inexorably from other – undisputed – evidence, the defendant

17

cannot raise a "genuine issue of material fact" by quibbling about the proper characterization of his relationship with CRM. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248. Because none of the CRM facts is "material," any disputes as to those facts are irrelevant to the Court's summary judgment analysis.

> D.    A Religious Purpose is Apparent From the Monument Itself

The Defendant does not even respond to the Plaintiffs' argument that a religious purpose is apparent from the monument itself. See Pls.' Mem. at 8-11. That argument draws on a substantial body of case law that supports a single conclusion: when the Ten Commandments are displayed on their own, more prominently than other texts, or alongside other religious statements, the display – as a matter of law – will be found to reflect a religious purpose. See id. This case is no exception.[12]

IV.    Whether the Monument Endorses Religion

The Defendant's assertion that there is a dispute of fact over whether the monument endorses religion rests on his previous contentions that there are factual disputes as to whether the Ten Commandments are religious and as to whether their placement in a "civic context" neutralizes their religious message. See Def.'s Resp. at 30. But, as stated above, both of these alleged "disputes" have been foreclosed by the United States Supreme Court's holding in Stone v. Graham, as well as by a litany of circuit and district court decisions from

---

[12] Even if the Defendant had been able to establish that he was motivated in part by a secular purpose, the behavior at issue here would still run afoul of the Constitution because an action motivated predominantly by religious purposes is "invalid even if the [government official] was motivated in part by legitimate secular objectives." City of Clearwater, 2 F.3d at 1527.

18

around the country and are, in any event, legal questions. See supra at pp. 8-10. In fact, rather than serving to diminish the endorsement of religion, the placement of the monument in the State Judicial Building actually enhances it. See Pls.' Mem. at 27-28 (citing numerous cases holding that presentation of Ten Commandments in context associated with justice is particularly troubling). The Defendant makes no effort to respond to these cases, or to those holding that the permanence of a display exacerbates its religious effect. See id. at 28. The Defendant also fails to respond to the cases holding that the presentation of the Commandments on tablet-shaped blocks, and their presentation alongside other religious references, exacerbate their religious effect. See id. at 21-23.

Most importantly for these purposes, the Defendant fails to contend with the fact that "whether a government activity communicates endorsement of religion is not a question of simple historical fact. [It is] in large part a legal question to be answered on the basis of judicial interpretation of social facts." Lynch v. Donnelly, 465 U.S. 668, 693-94 (1984) (O'Connor, J., concurring) (emphasis added). The Defendant appears to recognize that endorsement is a legal question, as he expends the bulk of this section of his brief arguing that government-sponsored displays of the Ten Commandments should be permitted "as a call to restore God's law as the higher law of the land," and that the Supreme Court erred when it reached the opposite conclusion in Stone. See Def.'s Resp. at 30-31. In support of this argument, the Defendant relies on academic commentary and then-Justice Rehnquist's dissenting opinion in Stone. See id. Once again, the Defendant has it backward: he urges the Court to ignore the holding of Stone, see supra at pp. 8-10, and to follow instead the principles set forth in a dissenting opinion authored by a single Justice and joined by no others. This invitation exemplifies the radical reworking of Establishment Clause

19

jurisprudence that is sought by the Defendant, and that is necessary in order for him to prevail in this case.

V.     _Marsh v. Chambers_ Does Not Apply

The Defendant argues in Section III of his brief that the Establishment Clause applies only to "laws" and not to religious displays; that the Court should employ the standard enunciated in Marsh v. Chambers, 463 U.S. 783 (1983), rather than the one adopted in Lemon v. Kurtzman, 403 U.S. 602 (1971); and that the display at issue here withstands the test of Marsh because there is a longstanding tradition of official governmental recognitions of God. See Def.'s Resp. at 31-45. These are legal, rather than factual arguments, and the third argument is irrelevant if the Defendant does not succeed on the second. The Plaintiffs will address each of these arguments in turn.

A.     Whether the Establishment Clause Is Limited to "Laws"

This argument barely merits a response. In support of it, the Defendant cites not a single Supreme Court case from the twentieth century, relying exclusively on two cases decided in the 1800s, and even those are equivocal on the point for which they are cited. See Def.'s Resp. at 35. But any ambiguity contained in those cases need not be parsed here because the high Court has, in subsequent years, put it to rest by applying the Clause in a variety of contexts not involving legislative action, including prayer at public school events, see Lee v. Weisman, 505 U.S. 577 (1992); access to public institutions, see McCollum v. Bd. of Educ., 333 U.S. 203 (1948); and, most pertinently here, religious displays. See County of Allegheny v. ACLU Greater Pittsburgh Chapter, 492 U.S. 573, 592 (1989); Lynch, 465 U.S. at 681-85. The Eleventh Circuit has done the same. See, e.g., Chabad-

Lubavitch of Ga. v. Miller, 5 F.3d 1383, 1388-95 (11th Cir. 1993) (en banc);[13] Rabun County, 698 F.2d at 1109-11; City of Milledgeville, 812 F.2d at 693-94; Cobb County, 811 F. Supp. at 676-78.

> B.     Whether *Marsh*, Rather Than *Lemon*, Is Applicable Here

In Marsh v. Chambers, 463 U.S. 783 (1983), the Supreme Court upheld the Nebraska legislature's practice of opening each session with a prayer given by a chaplain who was paid with public funds.   The Court based its decision on the fact that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country," id. at 786, and that the First Congress adopted the practice of opening its sessions with prayer and authorized the appointment of paid chaplains three days after finalizing the Bill of Rights.   Id. at 787-91.  The court focused its narrow holding on the "unique history" of legislative prayer, id. at 791, and noted that "[s]tanding alone, historical patterns cannot justify contemporary violations of constitutional guarantees."   Id. at 790; see also Walz v. Tax Comm'n of N.Y., 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it."); County of Allegheny, 492 U.S. at 603 ("Marsh plainly does not stand for the sweeping proposition. . .  that all accepted practices 200 years old and their equivalents are constitutional today.").  Indeed, the Supreme Court has repeatedly refused to extend the decision in Marsh or to apply the Marsh analysis to any other case in the almost twenty years since Marsh was decided.  See, e.g., Lee, 505 U.S. at 579; Allegheny, 492 U.S.

---

[13] The court in Chabad-Lubavitch found no Establishment Clause violation, 5 F.3d at 1935, but this was not because the display in question was not a "law."

573, 603-05; <u>Edwards v. Aguillard</u>, 482 U.S. 578, 583 n.4 (1987); <u>Wallace v. Jaffree</u>, 472 U.S. 38, 63 (1985).

The Defendant cites three cases in which courts have allegedly applied the <u>Marsh</u> test to religious displays (<u>see</u> Def.'s Resp. at 37), but none of these is binding on this Court. In contrast to these isolated cases, the courts that bind this Court – the United States Supreme Court and the Eleventh Circuit – have uniformly applied the <u>Lemon</u> test to religious displays. <u>See, e.g.</u>, <u>County of Allegheny</u>, 492 U.S. at 592; <u>Stone</u>, 449 U.S. at 40 (1980); <u>Chabad-Lubavitch</u>, 5 F.3d at 1388; <u>Rabun County</u>, 698 F.2d at 1109. The Defendant concedes that the "lower federal courts have applied the Lemon test to other Ten Commandments cases" (Def.'s Resp. at 31), but he asks the Court to reject the "flawed analyses from the recent rash of newly-minted Ten Commandments cases." <u>Id.</u> at 37. As the Defendant knows, this Court is not free to accept this invitation.

C.   <u>Whether There is a Longstanding Tradition of Governmental Recognitions of God</u>

The Defendant argues that there is a longstanding tradition of governmental proclamations and other actions that acknowledge God, of inscribing or adorning public property with religious language, and of judicial pronouncements acknowledging God. <u>See</u> Def.'s Resp. at 37-45. But none of the examples cited by the Defendant points to a longstanding tradition of displaying the text of the Ten Commandments, let alone displaying those Commandments alongside various other religious statements. Unlike the situation in <u>Marsh</u>, the First Congress did not adopt the practice of displaying the Ten Commandments. Although various public displays include references to religion (<u>see</u> Def.'s Resp. at 38), none of these involves a depiction of the Ten Commandments of the kind at issue here.

22

Finally, the judicial acknowledgments of God to which the Defendant cites are contained in written opinions (see id. at 39-45), which are hardly the equivalent of a large, tangible, permanent religious display.  A practice is properly upheld under Marsh only if, among other factors, that very practice, and not a related or similar practice, was prevalent at the founding and has continued without interruption ever since.  See County of Allegheny, 492 U.S. at 603 n.52 (noting that "just because Marsh sustained the validity of legislative prayer, it does not necessarily follow that practices like proclaiming a National Day of Prayer are constitutional"); N.C. Civil Liberties Union Legal Found. v. Constangy, 947 F.2d 1145, 1149 (4th Cir. 1991) (prayer by a judge in the courtroom is not comparable to legislative prayer).

Most importantly, whether there is or is not a longstanding tradition of displaying the Ten Commandments is irrelevant to the matter at hand because Lemon, rather than Marsh, provides the governing standard.  Lemon does not ask whether a practice can be justified on a historical basis; rather, it prohibits actions taken for a religious purpose, or with a religious effect, regardless of whether those actions involve a matter of longstanding tradition.

VI.    The Defendant's Brief Demonstrates That All Material Facts Are Undisputed

The Defendant's statement of facts, together with the documents attached to his response, provide the Court with ample evidence on which to grant summary judgment to the plaintiffs.  The Defendant concedes that Moore has erected a large monument on the south edge of the Rotunda of the Alabama State Judicial Building.[14]  Def.'s Resp. at 2-3.  He concedes that the monument contains the text of the Ten Commandments on top, set forth

---

[14] The Defendant acknowledges that the building houses the Alabama Supreme Court, the Court of Criminal Appeals, the Court of Civil Appeals, the State law library, and the Alabama Administrative Office of Courts.  See Def.'s Resp. at 8.

on rectangular tablets with rounded tops. Id. at 3-4. He further concedes that the four sides of the monument contain engraved quotations, each of which makes reference to "God," "Religious," "Creator," and/or "Divine." Id. at 4-5.

Justice Moore also concedes that the document entitled "Comments of Alabama Supreme Court Chief Justice Roy S. Moore Regarding Monument" (Def.'s Ex. K) "clearly reflect the purpose of the monument." Decl. of Moore, Def. Ex. EE. In that speech, Chief Justice Moore presented the monument as a recognition of the "source from which all morality springs." He explained that judges and government officials have denied the "higher law" and "absolute standards" of God, and that this has created a "whirlwind in our schools, in our homes, and in our work places." SUF ¶ 11. He concluded by saying: "May this day mark the beginning of the restoration of the moral foundation of law to our people and a return to the knowledge of God in our land." Id.

The religious purpose so manifest in Moore's unveiling speech is reiterated several times in the Defendant's opposition brief. For example, the Defendant describes his purpose for erecting the monument as follows:

> Such a call to restore God's law as the higher law of the land, as reflected in quotes on the monument from the Declaration of Independence, the Pledge of Allegiance, the National Motto and the Judiciary Act of 1789, is decidedly not a call to "venerate" the Ten Commandments, as plaintiffs have contended, but to return to them as the moral foundation of law.

Def.'s Resp. at 31 (emphasis added). Similarly, he states:

> [The monument] is a call to consider [the Ten Commandments] as providing the best source of 'absolute standards that serve as the moral foundation of law and which form the basis of morality,' as had been recognized from 'our earliest history in 1776 when we were declared to be the United States of America, [when] our forefathers recognized the sovereignty of God.'"

Id. at 25 (quoting Moore's unveiling speech, Def.'s Ex. K); see also id. at 25 (adopting

24

expert deposition testimony of Rabbi David Novak that "the Ten Commandments . . . are being presented as moral principles"); id. at 26 (adopting expert deposition testimony of Father Joseph Jensen that when presented in a courtroom, the Ten Commandments "can be considered just very, very good citizenship"); id. at 30 (adopting Stephen L. Carter's written statement that "displaying the Ten Commandments may be viewed as less about endorsing religion than about acknowledging and honoring what America stands for"); id. at 31 (implying that the monument "identif[ies] God as the source of moral obligation and [] urg[es] the American people to return to God's law as the solution to increased lawlessness in the land"); id. at 34 (stating the monument was erected "as a reminder of the commitment of the people of Alabama, to rely upon the favor and guidance of Almighty God").[15]

These facts -- on their own -- support two legal conclusions: first, that Justice Moore erected the monument with a religious purpose, see Pls.' Mem. at 8-11 (discussing cases in which courts have found a religious purpose, on the basis of the monument alone, when the Ten Commandments are displayed in isolation, more prominently than other texts, or alongside other religious excerpts); id. at 17-19 (discussing cases in which courts have found a religious purpose on the basis of statements that a Ten Commandments display is intended to depict or restore societal standards); and second, that the monument has the effect of endorsing religion.  See id. at 19-29 (discussing cases holding that presentation of Ten Commandments in isolation, more prominently than other texts, or alongside religious excerpts has a primarily religious effect).  If either of these two conclusions has been

---

[15] The Defendant does not argue that the inclusion of two additional plaques in the Rotunda of the State Judicial Building (see Pls.' Mem. at 6, 24-26) neutralizes the monument's religious effect.  Indeed, he concedes that these other two plaques are "inconspicuously located" over fifty feet away from, and are considerably smaller in size than, the Ten Commandments Monument. Def.'s Resp. at 6-7.

established by the Plaintiffs as a matter of law, they are entitled to summary judgment. See Edwards, 482 U.S. at 583 (1987) (affirming that Establishment Clause claim is meritorious if any one of the Lemon prongs is violated); Rabun County, 698 F.2d at 1109 (same). At a minimum, even if the Court believes that there are disputes of fact pertinent to the Plaintiffs' standing, partial summary judgment regarding purpose and effect would be appropriate, thereby limiting the matters that would need to be addressed at trial.

In light of the parties' agreement about the salient facts in this case, a trial is truly unnecessary. A trial would require the wasteful expenditure of considerable resources on the part of both the Plaintiffs and the Defendant, increase the Defendant's potential exposure to an attorney fee award in the event that the Plaintiffs prevail, and evoke a media circus. See 11 Moore's Federal Practice § 56.02 at 56-20 (3d ed. 1997) (recognizing that purpose of summary judgment is to "conserv[e] the parties' time and money and [to] permit[] courts to husband scarce judicial resources"). If material facts were in dispute, these consequences would be unavoidable; because they are not, summary judgment is due to be granted to the Plaintiffs.

Respectfully submitted,

Morris Dees (Ala. Bar No. DEE001)
Rhonda Brownstein (Ala. Bar No. BRO098)
Post Office Box 2087
Montgomery, Alabama 36102-2087

Ayesha Khan (DC Bar No. 426836)
Americans United for Separation of Church & State
518 C Street, NE
Washington, DC  20002

26

Robert J. Varley (Ala. Bar No. VAR002)
William Z. Messer (Ala. Bar No. MES002)
Varley & Messer, L.L.P.
229 S. McDonough Street
Montgomery, Alabama  36104

## CERTIFICATE OF SERVICE

I hereby certify that, on September 20, 2002, I served the foregoing document by United States First Class Mail, postage prepaid and properly addressed, on the following counsel:

> Hon. D. Stephen Melchior
> 2011 Central Avenue
> Cheyenne, Wyoming   82001
>
> Hon. Herbert W. Titus
> 5221 Indian River Road
> Virginia Beach, Virginia  23464
>
> Hon. Phillip L. Jauregui
> P. O. Box 43934
> Birmingham, AL   35243

Danielle J. Lipow
Post Office Box 2087
Montgomery, Alabama  36102-2087